UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

ARMEEN AKHTAR,

        Plaintiff,

   -v-                                   No.  19 CV 03763-LTS-DCF

SAUDIA d/b/a SAUDI ARABIAN
AIRLINES, CORP.,

        Defendant.

-------------------------------------------------------x

Memorandum Opinion And Order

      In this action, Plaintiff Armeen Akhtar ("Plaintiff" or "Ms. Akhtar") asserts claims against Defendant Saudia, doing business as Saudi Arabian Airlines, Corp. ("Defendant"), alleging discrimination on the basis of her gender and national origin, and retaliation in violation of 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., ("Title VII"); the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296(1)(a); and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-107(1)(a).  (See docket entry no. 36 (the "Amended Complaint" or the "AC"), at ¶ 1.)  The case is before the Court on Defendant's motion to dismiss Plaintiff's Amended Complaint in part, pursuant to Federal Rule of Civil Procedure 12(b)(6,) for failure to state a claim upon which relief can be granted.  (See docket entry no. 37.)  The Court has reviewed and considered thoroughly all of the parties' submissions filed in connection with the motion.  This Court has original jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, and supplemental jurisdiction of Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367.

For the following reasons, Defendant's partial motion to dismiss the Amended Complaint is granted in part and denied in part.

<u>BACKGROUND</u>

The following factual allegations are drawn from the AC and are taken as true for the purposes of this motion practice.

Ms. Akhtar, a U.S. citizen and female of Pakistani descent, was employed at John F. Kennedy Airport by Defendant, the national state-owned airline carrier for Saudi Arabia, for 22 years; she was hired in 1995 and her employment was terminated on July 31, 2017. (AC at ¶¶ 22-23, 210.) Throughout her career, Plaintiff was consistently promoted and recognized for her hard work and high-level performance. In 2002, she received her second promotion, and began providing administrative support to the station supervisor and supported Defendant's flight operations. (<u>Id.</u> at ¶ 28.) In 2008, she was sent to London to receive further training. (<u>Id.</u> at ¶ 29.) In 2011, she was encouraged to assist in VIP Flight Operations, an assignment reserved for top performing employees, and she received an Achievement Award that year for her performance in 2010. (<u>Id.</u> at ¶¶ 34-35.) Also in 2011, Plaintiff requested that she be assigned to the night shift so she and her husband could work opposite schedules in order to care for their children; Plaintiff's request was granted without issue. (<u>Id.</u> at ¶¶ 32-33.)

<u>Al Subaiy's Mistreatment of Plaintiff</u>

In July 2011, Husam Al Subaiy ("Al Subaiy") was hired as Plaintiff's station manager and direct supervisor. (<u>Id.</u> at ¶ 36.) Al Subaiy had spent his entire life in Saudi Arabia, where Pakistanis are considered to be of a lower class than Saudi citizens and have low caste jobs, and Pakistani women are considered to be even more inferior. (<u>Id.</u> at ¶ 38.) Like other of Defendant's managers and executives who treated Pakistanis as inferior, Al Subaiy treated

Pakistanis as though they were not "entitled to promotions or managerial roles or the same pay and benefits as Saudis [working for] Defendant – especially if they were women." (Id. at ¶¶ 39-40.) Al Subaiy spoke to Pakistanis, including Plaintiff, using a hostile tone and behaved in a hostile manner towards them. (Id. at ¶ 43.) He used the ethnic slur "Pakis" to refer to Defendant's Pakistani employees; excluded them from meetings; belittled them by dismissing their suggestions and questions and warning them not to challenge his authority; and spoke down to them in front of customers. (Id. at ¶¶ 42-46.) Al Subaiy treated male and non-Pakistani workers differently; he gave them more desirable positions, tasks, vacation dates and times; took them to sporting and other social events; excused their legitimate absences; and did favors for them. (Id. at ¶¶ 47-50.) "Al Subaiy did not treat lighter-skinned, White American or European workers, or any worker that spoke Arabic as opposed to Urdu, the native language of Pakistan, with hostility or discriminatory behavior." (Id. at ¶ 51.)

With respect to his treatment of Ms. Akhtar specifically, Al-Subaiy refused to offer Plaintiff training that was offered to non-Pakistani employees that were junior to her; spoke down to her in front of customers and colleagues; failed to defend Plaintiff when customers disrespected her; refused to excuse Plaintiff's absence from work when her daughter was sick; took credit for her work; and denied her requested vacation days without valid reason. (Id. at ¶¶ 45-49, 67, 81-84, 124.) He snapped at her when she spoke to her Pakistani colleagues in Urdu at lunch, on breaks, or as they left work together, stating: "Speak English. You are not in Pakistan[,]" despite regularly allowing others to speak Arabic at any time during work hours and regularly speaking Arabic at work himself. (Id. at ¶ 63.)

Al Subaiy also treated Ms. Akhtar as though she was his personal secretary, rather than Senior Operations Administrator, and ordered her to complete personal tasks for him

outside the scope of her work duties. (Id. at ¶52-53, 58.) For example, he asked her to arrange for his official United States documents and accommodation and utilities for his apartment, and asked her to research "good schools" for his children. (Id. at ¶¶ 52-53.) When he learned that "black children attended the school that Plaintiff had suggested to him for his children," he was "outraged" and "began screaming at Plaintiff." (Id. at ¶ 73.) When Plaintiff explained that she chose the school because it had "good student-teacher ratios, curriculums, and rankings," Al Subaiy became even more outraged and told Plaintiff not to challenge his authority. (Id.) He also assigned her higher-level tasks to non-Pakistani workers, and repeatedly demanded that Plaintiff perform tasks immediately while she was on vacation. (Id. at ¶¶ 54-55.) When Plaintiff asked to attend Operations training similar to the courses she had taken in London in the past, Al Subaiy ignored her and, for the next year, "refused to nominate or include Plaintiff for any training, even mandatory, required training." (Id. at ¶ 85.) Further, despite initially agreeing to allow Plaintiff to continue her night shifts, Al Subaiy altered her schedule to a day shift. (Id. at ¶ 86.)

        This pattern of mistreatment continued for years. For example, in August 2011, Al Subaiy discussed business matters with male colleagues in Arabic, a language foreign to Ms. Akhtar, and thereby "excluded [her] from necessary information to do her job, collegial conversation, and new work opportunities." (Id. at ¶¶ 60-61.) In or about July 3, 2012, Plaintiff was promoted to Lead Customer Service Agent ("Lead Agent"), which included a four percent raise in salary and altered job duties. (Id. at ¶ 88.) However, Al Subaiy refused to publicly announce it for months and expected Plaintiff "to complete her administrative duties in addition to her new Lead Agent job duties," which he did not expect of male Lead Agents. (Id. at ¶¶ 98-99.) In or about March 2013, Al Subaiy demanded Plaintiff empty her desk of 16 years for a

new employee without valid reason, and she was not given a new desk.  (Id. at ¶¶ 102-05.)  In or

about June 2014, Al Subaiy failed to complete Plaintiff's performance review, thereby

preventing her from receiving a promised raise in salary.  (Id. at ¶¶ 130-34.)  Plaintiff reported to

Defendant that Al Subaiy had sabotaged her on purpose so she would not get her raise, but

Defendant failed to investigate her complaint.  (Id. at ¶¶ 134-35.)

Retaliation after Plaintiff's First EEOC Charge

In September 2013, Plaintiff sent an official complaint about Al Subaiy's

treatment toward her to Defendant's Head Office as well as its Human Resources department,

but she is not aware of any action taken to address her case.  (Id. at ¶ 136.)  On April 24, 2014,[1]

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging

the "ongoing disparate treatment of women employees at Defendant."  (Id. at ¶ 137; see also

docket entry no. 38, Ex. A, the "First EEOC Charge".)  After Plaintiff filed the charge, Al Subaiy

promised to give special treatment to any Agents who "had dirt on Plaintiff"; incentivized

Plaintiff's co-workers to retaliate against her; threatened other employees that they would "also

suffer retaliation if they 'sided with Plaintiff'"; and humiliated Plaintiff in front of her

colleagues.  (AC at ¶¶139-40, 145, 153-55).  Plaintiff began receiving the silent treatment from

her co-workers and was excluded from staff meetings and trainings.  (Id. at ¶¶ 129, 142, 149-55.)

Plaintiff was similarly mistreated by other of Defendant's employees as a result of

her filing the First EEOC Charge against Defendant.  (Id. at ¶ 170.)  For example, in or about

June 2015, Defendant promoted Al Subaiy, despite Plaintiff's complaints of his mistreatment

toward her, and replaced him with Mohammad Al Ghamdi ("Al Ghamdi").  (Id. at ¶ 157-59.) Al

---

[1]     Plaintiff alleges in the Amended Complaint that the First EEOC Charge was filed on or
about September 22, 2013 (AC at ¶ 20.).  However, Defendant has proffered a copy of the
First EEOC Charge, which is dated April 24, 2014.  (See docket entry no. 38, Ex. A.)

Ghamdi also regularly ignored Plaintiff, excluded her from meetings, and failed to investigate or defend her complaints of mistreatment from other employees and customers.  (Id. at ¶¶ 157-65, 176, 205.)  Plaintiff was informed by another supervisor that Al Ghamdi "'was well-aware of her history of suing [Defendant]' from Manager of Operations Al Subaiy."  (Id. at ¶ 165.)  In or about July 2016, Defendant encouraged Agent Fernandez, a subordinate employee, to disrespect Plaintiff and undermine her authority because she had filed the First EEOC charge.  (Id. at ¶ 171-172.)  In or about August 2016, Plaintiff's title of "Issuing Officer" was removed after 19 years without valid reason.  (Id. at ¶¶ 177-78.)  In October 2016, an Administrative Coordinator falsely accused Plaintiff of not providing requested documents and stated that Plaintiff is "an expert at suing the company."  (Id. at ¶ 179-80.)  In or about November 2016, Plaintiff's desk was taken away and given to a male agent, the papers she kept at her desk were left scattered on the floor, her computer was replaced with a broken one, she was denied a drawer in which she could keep her documents, and she was forced to "sit at whichever desk was unoccupied for as long as she could until . . . ANY male employee [ ] needed or wanted a seat."  (Id. at ¶¶ 184-91.)  In or about December 2016, Plaintiff's vacation days were not approved, while those of male agents were approved.  (Id. at ¶¶ 193-96.)  On June 5, 2017, after Plaintiff felt uncomfortable because a passenger took a picture of her, refused to delete it and publicly treated her with disrespect, Al Ghamdi failed to defend her and refused to look at her, while apologizing to the passenger for Plaintiff's behavior.  (Id. at ¶¶ 199-205.)  Plaintiff generally alleges that the retaliation, discrimination, and hostile work environment she suffered as a result of the described examples "continued" at least beyond December 2016, including the incident on June 5, 2017, and "Defendant employees continued to fear being friendly or involved with Plaintiff, and she was generally kept from knowing anything about what was going on at Defendant.  She was

constantly forced to beg for information to complete her job." (Id. at ¶ 197.)  As a result of her

fear "that if she sued Defendant she would lose her job, where she had worked for the past 20

years," and she would jeopardize her mother's job with the Defendant, Plaintiff did not bring suit

within the requisite 90-day period after she received a Notice of Right to Sue for the First EEOC

Charge.  (Id. at ¶162-69.)

        On July 15, 2017, Plaintiff learned that Defendant was downsizing and intended

to terminate three employees and, on July 31, 2017, Plaintiff's employment was terminated.  (Id.

at ¶¶ 206, 210.)  Plaintiff alleges that her termination was not strictly due to downsizing, but

rather a convenient excuse for Defendant to "finally get rid of her."  (Id. at ¶ 208.)  Plaintiff

alleges that "other male and non-Pakistani agents who were less capable and less experienced

than Plaintiff were not eliminated," and asserts that "Plaintiff was terminated because of her

complaints of gender discrimination, and her Charge filed with the EEOC."  (Id. at 212.)

Furthermore, one of the other employees who was terminated around that time was also

Pakistani, and had worked at Saudia for even longer than Plaintiff had.  (Id. at ¶¶ 213-14.)

        On April 2, 2018, Plaintiff filed a second EEOC Charge, alleging discrimination

on the bases of sex and national origin, and retaliation.  (See docket entry no. 44, Ex. A, the

"Second EEOC Charge".)  She received a Notice of Right to Sue on March 15, 2019.  (Id. at Ex.

B.)  Plaintiff filed her complaint in this district court action on May 2, 2019.  (Docket entry no.

1.)

## DISCUSSION

        In her AC, Plaintiff asserts three causes of action, alleging that she was

discriminated against based on her gender and national origin, and subjected to retaliation in

violation of Title VII, Section 1981, NYSHRL, and NYCHRL.  Defendant moves, pursuant to

Federal Rule of Civil Procedure 12(b)(6), to dismiss the AC for failure to state a claim to the extent that: 1) Plaintiff asserts national-origin based Section 1981 claims, arguing that Section 1981 does not provide a cause of action for national origin claims; 2) Plaintiff asserts a national origin discrimination claim under Title VII, arguing that Plaintiff failed to properly exhaust her administrative remedies in connection with her Title VII national origin claim; and 3) Plaintiff asserts claims for injuries that arise from time-barred allegations under Title VII, NYSHRL and NYCHRL.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A proper complaint cannot simply recite legal conclusions or bare elements of a cause of action; there must be factual content pleaded that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The Court accepts as true the nonconclusory factual allegations in the Amended Complaint and draws all reasonable inferences in the nonmoving party's favor. Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

Section 1981 Claims

Defendant moves to dismiss Plaintiff's Section 1981 claims for discrimination and retaliation on the basis of her national origin, arguing that such claims are not actionable under Section 1981, which provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons . . . as is enjoyed by white citizens . . . ." 42 U.S.C.A. § 1981(a) (WestLaw current through P.L. 117-11 with the exception of P.L. 116-283). To establish a claim for discrimination under

Section 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) defendant's intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities.  Brown v. City of Oneonta, 221 F.3d 329, 339 (2d Cir. 2000).  It is well-settled that a plaintiff may not bring suit under Section 1981 for discrimination based on national origin.  See Anderson v. Conboy, 156 F.3d 167, 170 (2d Cir. 1998).

The Supreme Court has held, however, that Section 1981 "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."  Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987) ("[I]f respondent [ ] can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.")  While "discrimination based on birthplace alone is insufficient to state a claim under [Section] 1981[,]" the line between discrimination based on ancestry or ethnic characteristics on the one hand, and discrimination based on place or nation of origin on the other hand, "is not a bright one."  Id. at 614 (Brennan, J. concurring) (emphasis in original).  As Justice Brennan explained in his concurring opinion in Al-Khazraji:

> It is true that one's ancestry—the ethnic group from which an individual and his or her ancestors are descended—is not necessarily the same as one's national origin—the country where a person was born, or, more broadly, the country from which his or her ancestors came . . . Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group.  Moreover, national origin claims have been treated as ancestry or ethnicity claims in some circumstances.  For example, in the Title VII context, the terms overlap as a legal matter.  See 29 C.F.R. § 1606.1 (1986).

Id. (internal citations and quotation marks omitted) (emphasis in original); see also Wenchun Zheng v. General Electric Company, 2016 WL 10859373 at *13 (N.D.N.Y. 2016) ("[C]ourts

have also recognized that race and national origin discrimination claims may substantially overlap or even be distinguishable depending on the specific facts of a case, as national origin may be intertwined with racial and ethnic characteristics.") (internal quotation marks omitted).

Accordingly, "the Second Circuit has urged courts to be cautious: where the line between national origin discrimination and racial discrimination is difficult to trace, courts have warned that an attempt to make such a demarcation before both parties have had an opportunity to offer evidence at trial is inappropriate." Wenchun Zheng, 2016 WL 10859373 at *13 (internal quotation marks and alterations omitted) (citing Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir. 2003)). Indeed, the Court of Appeals has noted that "courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry prior to the full development of a plaintiff's claims, given the potential overlap between the two forms of discrimination, and the 'loose pleading' which is permitted in the EEOC complaint." Id. (internal quotation marks omitted) (finding that where Plaintiff solely cited national origin discrimination as the basis of his Section 1981 claim, the court would review the claim "to the extent that he may be alleging discrimination due to his ancestry and/or ethnic characteristics, rather than solely because of his Chinese national origin.") Therefore, at the pleading stage, courts may construe national origin claims as ancestry and/or ethnicity claims where the factual allegations are sufficiently descriptive to state a claim for discrimination based on race, which includes different ethnic groups. See, e.g., Kim v. Dial Service Insetern., Inc., No. 96 Civ. 3327 (DLC), 1997 WL 5902, at *4 (S.D.N.Y. 1997) (holding that plaintiff had sufficiently stated a Section 1981 claim at for discrimination based on race to survive a motion to dismiss where the defendants allegedly subjected plaintiff to harassment and other mistreatment and treated him differently from Japanese employees because of his Korean national origin and

race); Cf. Ahmed v. Samson Management Corp., 1996 WL 183011, *6 (S.D.N.Y. April 17,

1996) (dismissing with leave to amend complaint that included a statement that the plaintiff was

"Egyptian" but was otherwise devoid of allegations of discrimination based on plaintiff's

ancestry or ethnicity sufficient to state a Section 1981 claim).

        Here, Defendant argues that the AC alleges discrimination only on the basis of

national origin, not ancestry or ethnicity, and thus Plaintiff's Section 1981 national origin claims

must be dismissed.  Plaintiff concedes that Section 1981 does not prohibit discrimination based

on national origin, but argues that her Section 1981 claim should not be dismissed because the

AC plausibly states a claim for discrimination based on Plaintiff's ancestry and ethnicity.[2]

Plaintiff alleges that Al Subaiy snapped at her when she spoke to her colleagues in Urdu despite

regularly speaking with colleagues in Arabic himself, used the term "Paki", an ethnic slur,

against her, treated her as inferior to her non-Pakistani colleagues, and that Defendant failed to

address these instances of discrimination when Plaintiff formally complained of discrimination.

Plaintiff's account of the discrimination she endured, read in the light most favorable to her,

plausibly alleges that she was not discriminated against solely because of her gender or nation of

---

[2]     Defendant alleges that it consented to Plaintiff's amendment of the complaint on the condition that Plaintiff withdraw her Section 1981 national origin and retaliation claims. (See docket entry no. 39 at 2.)  Plaintiff did not withdraw the claims and explains in her opposition memorandum that her decision not to withdraw the claims was not in bad faith; rather, she represents that, upon further research, she learned that she had already pled viable claims for discrimination based on her ethnicity and ancestry.  (See docket entry no. 43 at 15.)  The Court finds consideration of Plaintiff's Section 1981 claims appropriate for the purposes of the instant motion in light of the facts that, as Plaintiff points out, Defendant is not prejudiced by Plaintiff's mistake given that Plaintiff has also asserted national origin claims under the NYCHRL and NYSHRL, and because Defendant should have known that Plaintiff had a potentially viable ancestry or ethnicity-based Section 1981 discrimination claim.  Furthermore, even if the Defendant had refused to consent to Plaintiff's amendment of the Complaint, Plaintiff claims she would have sought leave from the Court to amend her complaint. For the foregoing reasons, the Court would have granted such a request.

origin, but also because she was ethnically Pakistani and of Pakistani descent. Indeed, Plaintiff

has recognized this distinction between claims based on national origin and ethnicity or ancestry,

and has proffered in connection with her opposition to this motion a Proposed Second Amended

Complaint in which she sufficiently identifies her Pakistani ancestry and ethnicity as a basis of

her Section 1981 claim of discrimination and retaliation. (See docket entry no. 44 Ex. D at ¶¶

38-59, 221-231.) The Court will permit Plaintiff to file the Second Amended Complaint, which

asserts a Section 1981 claim for discrimination based on her Pakistani ancestry and/or ethnicity.

See Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so

requires").

       Plaintiff further alleges that, after she filed her First EEOC Charge alleging

discrimination, Al Subaiy and other employees working for Defendant retaliated against her.

According to Plaintiff, Al Subaiy repeatedly warned Plaintiff's colleagues not to side with

Plaintiff and asked them if they had dirt on her; Plaintiff's colleagues made several comments

harassing Plaintiff for filing an EEOC Charge against the Defendant; and Plaintiff was routinely

excluded from meetings and trainings and deprived of information she needed to do her job.

Plaintiff also alleges that Defendant ultimately terminated her employment for pretextual reasons

as a means of discrimination and retaliation. Based on these allegations, Plaintiff has also stated

plausibly a Section 1981 claim for retaliation as a result of her filing an EEOC charge alleging

discrimination based on protected traits.[3]

       For these reasons, the Court denies Defendant's motion insofar as it seeks

dismissal of Plaintiff's section 1981 claims as articulated in the Amended Complaint.

---

[3]      As explained below, Plaintiff's EEOC charge was sufficient to implicate a claim
of discrimination based on ancestry or ethnicity.

The Court will permit Plaintiff to file the proposed Second Amended Complaint, which asserts her Section 1981 claim on the basis of her ethnicity and ancestry.

<u>Administrative Exhaustion of Title VII National Origin Claim</u>

The Defendant also argues that Plaintiff's Title VII national origin discrimination claim must be dismissed for her failure to administratively exhaust the claim. Before seeking redress in federal court under Title VII for employment discrimination, a plaintiff must first address the alleged discrimination in a timely complaint to the EEOC or a state agency with equivalent authority. <u>See</u> 42 U.S.C, § 2000e–5(e). However, where a plaintiff's claims in a discrimination suit are "reasonably related" to the allegations raised in her prior EEOC complaint such that the "conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made[,]" the administrative exhaustion requirement is met. <u>Williams v. N.Y.C. Hous. Auth.</u>, 458 F.3d 67, 70 (2d Cir. 2006). In conducting such an analysis, the court must focus on the "factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving[,]" and determine whether the charge gave the EEOC "adequate notice to investigate discrimination on both bases." <u>Id.</u> (internal quotations, citations, and alterations omitted).

Here, the Defendant argues that the EEOC investigators were not given adequate notice of Plaintiff's Title VII discrimination claim based on national origin, for two reasons: 1) Plaintiff did not consistently check the "national origin" box on the EEOC Form 5 in connection with her Second EEOC Charge; and 2) Plaintiff did not explicitly identify "national origin" as a basis for the discrimination she endured within the factual allegations appended to the Second EEOC Charge, which the Defendant argues was entirely "void of <u>any</u> facts establishing circumstances that gave rise to an inference of discrimination based on national origin." <u>See</u>

docket entry no. 39 at 7 (emphasis in original).  Defendant argues that it was improper for the Plaintiff to raise a Title VII national origin discrimination claim within the AC because such a claim is "wholly unrelated to [her] administrative charge" and therefore "may not be brought in federal court without independent exhaustion."  Id.  The Court disagrees.

In her Second EEOC Charge, Plaintiff alleged that she is a United States citizen of Pakistani descent, and that Al Subaiy, who was of non-Pakistani descent and lived his entire life in Saudi Arabia, would intentionally speak to Plaintiff's colleagues in Arabic in Plaintiff's presence because he knew Plaintiff did not speak Arabic, as a means of depriving her of "necessary information to do her job, collegial conversation, and new work opportunities."  See Second EEOC Charge at ¶¶ 1, 5, 23, 29-31.  Plaintiff also alleged that Al Subaiy asked her to do personal tasks for him that were outside of her job description, such as researching schools for his children, and became outraged at her when she refused to support his racist beliefs, which further illustrated that his "antiquated, stereotypical and discriminatory beliefs about women and certain minorities were not going to change."  Id.  at ¶¶ 41-44.

Having reviewed thoroughly the Second EEOC Charge, the Court concludes that, even though Plaintiff did not include the actual words "national origin" within the factual narrative of her EEOC charge, the factual underpinnings of her discrimination and retaliation allegations in the administrative complaint, and her indication on at least one page of the EEOC form that she was alleging employment discrimination on the basis of her national origin, were sufficient to put the investigators on notice that her complaint also implicated a claim of discrimination based on national origin, ancestry or ethnicity under Title VII.  Contrary to Defendant's argument, Plaintiff did not raise "entirely new" and "wholly unexhausted" claims in her AC; Plaintiff's national origin claims under Title VII were reasonably related to the factual

allegations set forth in her Second EEOC Charge.  Accordingly, the Court finds Plaintiff has administratively exhausted her national origin discrimination claim under Title VII.  See Williams, 458 F.3d at 70 (finding that that, even though the box for sex on the EEOC charge form was not checked off, it was error for the district court to dismiss Plaintiff's claim for failure to exhaust her administrative remedies because the "factual underpinnings" of a gender discrimination claim were presented in the complaint made to the EEOC).  For these reasons, the Defendant's motion to dismiss Plaintiff's Title VII national origin discrimination claim is denied.

Timeliness of Certain Claims

Defendant argues that Plaintiff's discrimination and retaliation claims should be dismissed to the extent that they are based on time-barred allegations under Title VII, the NYSHRL and the NYCHRL.  Plaintiff argues that her claims are not time-barred because the discriminatory and retaliatory acts alleged in the AC may be considered in their entirety under the continuing violations doctrine.

Title VII Claims

Title VII claims of discrimination and retaliation must be filed with the Equal Employment Opportunity Commission ("EEOC") or dual filed with the New York State Department of Human Rights within 300 days of the alleged discriminatory or retaliatory act. See 42 U.S.C. § 2000e-5(e)(1); McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010).  Where "a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct." McGullam, 609 F.3d at 75 (internal quotation marks omitted).  For example, "[w]ith respect to claims based on termination, failure to promote, denial of transfer, or refusal to hire, . . . section 2000e–5(e)(1) precludes recovery for discrete acts of discrimination or retaliation that

occur outside the statutory time period, even if other acts of discrimination occurred within the statutory time period." Id. (internal quotations and citation omitted) (emphasis in original); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.")

Moreover, the Supreme Court has "held that discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." Morgan, 536 U.S. at 112. For example, the Court in Morgan explained that, in the case of a professor who was allegedly denied academic tenure as a result of his national origin, but instead offered a contract to continue employment for an additional year, the professor could not claim a "continuing violation" such that his clock to file a timely EEOC complaint did not begin to run until his actual termination. Id. at 112-13 (citing Delaware State College v. Ricks, 449 U.S. 250 (1980)). The Court explained that the professor "could not use a termination that fell within the limitations period to pull in the time-barred discriminatory act. Nor could a time-barred act justify filing a charge concerning a termination that was not independently discriminatory." Id. at 113.

However, "[h]ostile work environment claims are different in kind from discrete acts[,]" for their "very nature involves repeated conduct" and a break in continuity is not necessarily fatal to the claim. Morgan, 536 U.S. at 115-18. A successful Title VII hostile work environment claim must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). A hostile work

environment, however long it lasts, is "a single unlawful employment practice," the occurrence of which triggers the EEOC charge requirement, and the charge may be filed within 300 days of any occurrence forming part of the hostile work environment. <u>Morgan</u> at 117, 123. Where a plaintiff alleges a hostile work environment, courts may consider the entire scope of the claim for the purposes of assessing liability, "including behavior alleged outside the statutory time period . . . so long as an act contributing to that hostile environment takes place within the statutory time period." <u>Id.</u> at 105. In determining whether the unlawful and hostile behavior alleged outside the statutory time period should be considered part of a single hostile work environment "courts [must] make an individualized assessment of whether incidents and episodes are related"; such a flexible approach is particularly useful "in a context as fact-specific and sensitive as employment discrimination and as amorphous as hostile work environment." <u>McGullam</u>, 609 F.3d at 77 (citing <u>Morgan</u>, 536 U.S. at 118, 120-21).

Plaintiff filed her Second EEOC charge on April 2, 2018. Accordingly, Defendant argues that any conduct occurring before June 6, 2017, 300 days before Plaintiff's filing of the Second EEOC Charge, is time-barred under Title VII, and that the only actionable conduct alleged is Plaintiff's termination from employment on July 31, 2017. Defendant submits that: 1) Plaintiff failed to allege any discriminatory acts within the six-month period of December 2016 and June 2017, such that there was a clear break in the alleged continuum of discrimination; 2) the completed and discrete act of her termination is not of a continuing nature; and 3) Plaintiff has not otherwise demonstrated compelling circumstances warranting application of the continuing violation doctrine. Furthermore, Defendant argues that any allegations set forth in Plaintiff's First EEOC Charge in 2014 are also time-barred because Plaintiff failed to file a lawsuit within 90 days of receiving a Notice of Right to Sue on December 28, 2015. <u>See</u>

McLeod v. Lowe's Home Improvement, No. 9 CV 834 NAM/DRH, 2010 WL 4366901, at *5 (N.D.N.Y. Oct. 28, 2010) ("[T]o the extent that the claims underlying the second right-to-sue notice involved the same facts as the claims underlying the first right-to-sue notice, plaintiff's time to bring suit in this Court began to run when he received the first notice, and such claims are time-barred.")

The Defendant is correct in arguing that the completed and discrete act of Plaintiff's termination in July 2017 is insufficient to "pull in the time-barred discriminatory act[s]" that allegedly occurred prior to June 6, 2017, when Plaintiff's 300-day clock began to run. See Morgan, 536 U.S. at 113. Termination of employment is a discrete act which individually triggers the start of a filing period, and cannot be used to save otherwise time-barred acts that form the basis of a Title VII claim under a "continuing violation theory," as Plaintiff suggests. Similarly, to the extent Plaintiff's AC can be liberally construed to allege that other discrete acts of discrimination occurred both within and outside of the statute of limitations period, for example denials of vacation days, raises in salary, and specific promotions, such actions are insufficient to independently qualify as a sound basis for her Title VII claim where they are time-barred, or otherwise to provide bases to "pull in" time-barred discriminatory acts occurring before June 2017. Therefore, Defendant's motion to dismiss is granted insofar as the AC rests its Title VII claim on discrete acts of discrimination occurring prior to June 2017.

However, to the extent Plaintiff pleads a hostile work environment claim based on actions that do not qualify as discrete acts but rather constitute unlawful behavior contributing to the existence of an abusive working environment, her claim not only survives but also encompasses such conduct that she complained of in both her First and Second EEOC Charges. In the AC, Plaintiff alleges that, after Al Subaiy became her supervisor in 2011, he regularly

insulted her, excluded her from meetings and business conversations, belittled her in front of customers and colleagues, refused her trainings offered to employees that were junior to her, ordered her to complete menial tasks outside of her work duties, and deprived her of high-level tasks. After Plaintiff filed her First EEOC Charge in 2014, Al Subaiy allegedly continued his mistreatment of her; incentivized her supervisors and colleagues to retaliate against her; informed Al Ghamdi, his successor, about Plaintiff's First EEOC Charge, thereby encouraging Al Ghamdi's mistreatment of Plaintiff; and engineered a work environment in which Plaintiff was consistently humiliated, excluded from meetings, and mistreated by her colleagues. Plaintiff alleges that such discriminatory acts were directed toward her because she was a Pakistani female, and that male or non-Pakistani workers were not treated similarly. Moreover, she asserts that the discrimination, retaliation and hostile work environment she endured up until her termination was primarily a result of Al Subaiy's unlawful behavior directed toward her and his encouragement of others to treat Plaintiff similarly.

The unlawful behavior Plaintiff alleges not only demonstrates plausibly the existence of a workplace "permeated with discriminatory intimidation, ridicule, and insult" that is severe and pervasive enough to create an abusive working environment, but comprises numerous incidents sufficiently connected to each other, including by way of a common instigator, to rise to the level of a hostile work environment that persisted for six years. See Morgan, 536 U.S. at 116. Importantly, Plaintiff's allegation that the pattern of discrimination and retaliation that comprised the abusive work environment she described in detail as occurring between 2011 and December 2016 "continued" beyond December 2016, including an incident of ridicule occurring on June 5, 2017, plausibly demonstrates that the qualifying unlawful conduct continued to occur up until her termination in 2017. Therefore, Plaintiff's allegations concerning

the discriminatory harassment, ridicule and insult she faced are sufficient at this stage to state a

claim for a single unlawful employment action that commenced in 2011 and continued up until

her termination in July 2017, to the extent such acts do not qualify as individual, discrete acts of

discrimination that are otherwise time-barred.[4]

For these reasons, the Court finds that Plaintiff has plausibly stated a timely Title

VII discrimination claim on the basis of a hostile work environment.  For these reasons, the

Court denies Defendant's motion to dismiss Plaintiff's Title VII claims.

NYSHRL Claims

Plaintiff also asserts gender and national origin discrimination, as well as

retaliation claims under the NYSHRL.  Like claims brought under Title VII, "[t]he NYSHRL

similarly prohibits employers from discriminating against [an] individual in compensation or in

terms, conditions or privileges of employment. . . The pleading standards are generally the same

for Title VII [ ] and NYSHRL claims."  Cardwell v. Davis Polk & Wardwell LLP, No. 1:19-CV-

10256-GHW, 2020 WL 6274826, at *16 (S.D.N.Y. Oct. 24, 2020) (internal quotation marks and

citation omitted).  The NYSHRL statute of limitations is three years. See Kassner v. 2nd Ave.

Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007).  "Although the Second Circuit has yet to

definitively opine on the issue of whether the filing of a charge with the EEOC serves to

automatically toll the statute of limitations on claims asserted under the NYSHRL, numerous

courts in this Circuit have held that the three-year statute of limitations applicable to claims

---

[4]       To the extent that Plaintiff's claims rely on discrete acts of discrimination that are
        otherwise time-barred, the Court is entitled to consider such facts as evidence in
        support of Plaintiff's timely claim.  See Morgan, 536 U.S. at 113 (A plaintiff may
        use prior related, discriminatory acts occurring outside of the statutory limitations
        period background evidence in support of a timely claim, "so long as the
        actionable acts are independently discriminatory and charges addressing those
        acts are themselves timely filed").

under the NYSHRL is tolled during the period in which a complaint is filed . . . with the EEOC." Tenecora v. Ba-kal Rest. Corp., No. CV187311DRHAKT, 2020 WL 8771256, at *19 (E.D.N.Y. Nov. 30, 2020), report and recommendation adopted in part, No. 218CV7311DRHAKT, 2021 WL 424364 (E.D.N.Y. Feb. 8, 2021) (internal quotation marks omitted). "[C]ontinuing violations [under the NYSHRL] are assessed no differently than under federal law." Williams v. New York City Dept. of Education, 19 Civ. 1353 (CM), 2019 WL 4393546, at *18 (S.D.N.Y. 2019); see also Taylor v. City of New York, 207 F.Supp.3d 293, 302 (S.D.N.Y. 2016) ("[T]he continuing violations doctrine of the NYSHRL mirrors that of Title VII [such that] discrete acts of [discrimination]. . . cannot be considered a continuing violation under the NYSHRL."). Defendant argues that Plaintiff's claims under the NYSHRL must be dismissed to the extent they arise out of alleged discriminatory acts that occurred prior to April 2, 2015, approximately three years prior to Plaintiff's filing of the Second EEOC Charge, for such acts are untimely.

　　　As explained above, Plaintiff alleges several discriminatory and retaliatory acts that both contributed to the makings of an abusive working environment at Saudia, and also constituted discrete acts of discrimination within the three-year limitations period under the NYSHRL.  After Plaintiff filed her First EEOC charge in 2014 and Al Ghamdi became her supervisor in June 2015, Plaintiff alleges that Al Ghamdi discriminated and retaliated against her because Al Subaiy had told Al Ghamdi about Plaintiff's First EEOC charge, thereby encouraging Al Ghamdi's mistreatment of Plaintiff.  To the extent Plaintiff alleges that Al Ghamdi regularly ignored Plaintiff, excluded her from meetings, refused her training opportunities, failed to investigate or defend her complaints of mistreatment from other employees and customers, and allowed or encouraged other employees to mistreat her, and that her workstation was given  to a male employee, Plaintiff has plausibly stated a claim of a hostile work environment under the

NYSHRL that, like her claim under Title VII, encompasses all such discriminatory conduct occurring between 2011 and 2017. Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's NYSHRL claim to the extent it is based on discriminatory acts that constituted elements of an abusive or hostile working environment.

However, to the extent Plaintiff alleges discrete acts of discrimination that occurred prior to the time the three-year statute of limitations under the NYSHRL began to run on April 2, 2015—for example, removal of her job title or denial of the same amount of paid vacation offered to her male counterparts—Defendant argues correctly that such discrete acts are time-barred and cannot support Plaintiff's claim under the NYSHRL. Defendant's motion to dismiss Plaintiff's NYSHRL claim is granted to the extent her claim is based on time-barred, discrete acts of discrimination that occurred prior to April 2, 2015.

NYCHRL Claims

Plaintiff also asserts gender and national origin discrimination and retaliation claims under the NYCHRL. To plead a discrimination claim under the NYCHRL, a plaintiff must allege only that "she [was] treated 'less well' . . . because of a discriminatory intent." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013) (citation omitted). "[T]o plausibly plead a retaliation claim under the NYCHRL, the plaintiff must [allege] that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." Cardwell, 2020 WL 6274826, at *30 (internal quotation omitted). The NYCHRL statute of limitations is three years and, like claims brought under the NYSHRL, courts in this district have found that the three-year statute of limitations for claims brought under the NYCHRL "are tolled during the period in which a complaint is pending before the EEOC."

Humphreys v. New York City Health & Hosps. Corp., No. 16-CV-9707 (VSB), 2018 WL 3849836, at *3 (S.D.N.Y. Aug. 10, 2018) (collecting cases).  Unlike claims asserted under Title VII and the NYSHRL, claims brought under the NYCHRL must "be construed liberally." Mihalik, 715 F.3d at 110.  Accordingly, New York courts have held that the pre-Morgan continuing violations doctrine continues to apply under the NYCHRL and consider otherwise time-barred discrete acts "timely where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice."  Taylor, 207 F. Supp. 3d at 299, 302 (internal quotation marks omitted) (finding that, even though plaintiff's Title VII and NYSHRL claims that the discrete acts of defendant's failure to hire plaintiff 14 separate times were not saved by the continuing violation doctrine, they survived under the NYCHRL).  However, at the motion to dismiss stage, some courts have declined to decide whether the continuing violation doctrine applies because "determining whether the events comprising the basis for [a] plaintiff's claim are part of a single, continuous course of conduct is a fact-intensive inquiry."  Cardwell, 2020 WL 6274826, at *39 (internal quotation marks omitted) (declining to parse how the continuing violation doctrine applied to plaintiff's claims under the NYCHRL because resolution of the issue would have no impact on discovery and it "will be simpler to adjudicate whether [plaintiff's] claims are timely at a subsequent stage of litigation when the Court can look beyond the pleadings.")

Under a liberal construction of Plaintiff's NYCHRL claim, Plaintiff's allegations of discriminatory acts occurring prior to April 2, 2015—three years before she filed the Second EEOC Charge and when her NYCHRL statute of limitations period began to run—are timely under the continuing violations doctrine to the extent that they are a continuation of related incidents of discriminatory practice that continued to occur after April 2, 2015.  Plaintiff alleges

that, from the point Al Subaiy was hired in 2011 until Plaintiff's termination in 2017, she was the target of numerous discriminatory acts as a result of her protected characteristics. Generally, and for the reasons explained above in connection with Plaintiff's surviving hostile work environment claims, Plaintiff's allegations are sufficient to plausibly state a claim for discrimination and retaliation under the broader NYCHRL standards. However, at this stage in the litigation, the Court need not determine, and is indeed incapable of ascertaining precisely, the extent to which the acts complained of in the AC are related and which ones may be time barred. For these reasons, the Court denies Defendant's motion to dismiss Plaintiff's NYCHRL claims.

CONCLUSION

For the foregoing reasons, Defendant's partial motion to dismiss Plaintiff's claims is granted to the extent the AC relies on time-barred discrete acts of discrimination as the basis for her Title VII and NYSHRL claims, and is denied in all other respects. Plaintiff is granted leave to file the Second Amended Complaint at docket entry no. 44-4 within 21 days of the date of this Memorandum Opinion and Order to allege claims of discrimination under Section 1981 on the basis of her ancestry and/or ethnicity.

This Memorandum Opinion and Order resolves docket entry no. 37.

This case continues to be referred to Magistrate Judge Freeman for general pre-trial management.


SO ORDERED.

Dated: New York, New York
      May 4, 2021


            /s/ Laura Taylor Swain
            LAURA TAYLOR SWAIN
            Chief United States District Judge